O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| TIA SHARON REED, | Case No. ED CV 13-01788 DFM |
| Plaintiff, | |
| v. | MEMORANDUM ORDER AND OPINION |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Tia Sharon Reed ("Reed") appeals from the final decision of the Administrative Law Judge ("ALJ") denying her application for disability insurance benefits and supplemental security income benefits. For the reasons stated below, the Commissioner's decision is affirmed.

## I.

## BACKGROUND

Reed applied for supplemental security income and disability insurance benefits on April 28, 2009, alleging disability beginning June 30, 2008. Administrative Record ("AR") 257-62. The Commissioner denied Reed's claims on June 22, 2009 and denied them again on reconsideration on October

30, 2009. AR 152-62. Reed requested a hearing. AR 163. The ALJ held two hearings, one on September 27, 2010 and one on December 7, 2010. See AR 89-147.

**A.   First Hearing**

At the first hearing, Reed testified that she had not worked since her parents fired her from a job at a church in June 2006 after they caught her reading The Science of Mind and accused her of "devil worship." AR 93-94, 98. She testified that she was homeless for nine months, during which time unnamed abductors held her against her will, took her to San Francisco and Las Vegas, and forced her to engage in illegal activity. AR 94-95. During her captivity, "they" held her in a hotel for three days and put "drugs in [her] ass." AR 95. The same unidentified persons then slammed her head into the ground, and after the swelling went down, they left and she went to the doctor. Id. At some point during these events, Reed was arrested along with a man she implied was her pimp; she claimed that she told the police that she was being held against her will, but she was still taken to jail.[1] AR 96-97.

Reed testified that she had never used illegal drugs, other than when forced to. AR 99, 102. She acknowledged that the Riverside Department of Mental Health diagnosed her with cocaine abuse and hallucinogen abuse in February 2009; she claimed that she told the hospital staff that her abductors put ecstasy in her body, but they did not believe her. AR 103.

_____

[1] Reed's medical records clarify this narrative somewhat and reflect the following claims by Reed: at some point in 2008, a physically-abusive ex-boyfriend "turned her out" for prostitution and she "had to make porn movies" (AR 392, 400, 472); she was abducted and taken to Las Vegas (AR 400); she was abducted by two men and sexually abused for a 3-day period (possibly the same Las Vegas abduction), and these men smashed her head into the sidewalk (AR 512-13); and she was arrested in Las Vegas for prostitution but "never went back to face it" (AR 390).

Reed testified that she did not know how she received a 100% service-connected rating from the Veterans Administration ("VA"). AR 95. A VA representative had called Reed on the telephone and stated that the VA would give her a sum of money each month. AR 96. Reed testified that these VA benefits pay for her rent and groceries. AR 99.

Reed stated that she was not comfortable leaving the house. AR 96. The last time she recalled receiving behavioral health treatment was on November 1, 2008, when she stayed overnight at a hospital in Riverside, California. AR 96, 102.

Reed testified that she used to be very intelligent and put her resume on Monster.com and CareerBuilders.com, but was unable to find work. AR 98. She stated that she felt that her right eye turns inward, she gets a migraine after looking at a computer screen for five minutes, and she can no longer read for more than five minutes. AR 98-99.

Reed testified that she joined the Navy after school (presumably high school, see AR 119) and studied child development because she wanted to be a preschool teacher. AR 99. She spent her time in the Navy on a ship that transported Marines. AR 99-100.

Dr. David Glassmire, an independent medical expert and clinical psychologist, appeared at the hearing telephonically. AR 100. Reed told Dr. Glassmire that she did not remember the last time she received psychological treatment. AR 101. She recalled having a brain scan at the "VA" for brain damage, as well as an EKG and an MRI. Id. Dr. Glassmire asked the ALJ for an opportunity to conduct psychological testing on Reed, and the ALJ granted the request. AR 104-10.

**B.    Second Hearing**

After Reed underwent psychological testing, the ALJ held a second hearing. Reed testified that she was uncomfortable leaving Riverside because

3

she was only permitted to drive short distances. AR 119-20. She "has trouble" being driven places, but did not know why. AR 120. Reed testified that she was not receiving any counseling because she did not want to leave Riverside and the VA did not have a local doctor in Riverside available. AR 121-22. She acknowledged that someone could drive her to the VA hospital in San Bernardino. AR 122-23.

Reed recalled visiting a doctor for the October 2010 psychological exam that took place between the two hearings. Id. She claimed that on the day of the exam, she hit herself in the head with her car door during the lunch break, fell down, and passed out for "a while." Id. She went home but was called back for the test. AR 124.

Reed again testified that she had never been a drug user and had only done drugs when compelled by her abductors or when she needed them to stay awake all night during her abduction. AR 126-27. Reed testified that after her parents fired her, she lost her house, her children went to stay with her mother, and she began "working in that bar and that's how [she] got taken to San Francisco." AR 127.

Reed recalled that a VA hospital gave her a prescription for anti-depressants. AR 128-29. Reed claimed that the medication has not helped because her depression is not inherited; she had her "head slammed on the ground and now [her] brain doesn't work." AR 129.

Reed testified that she took her two children back from her mother after her mother brought them over for a birthday celebration and Reed remembered that she was supposed to take care of them. AR 130-31. Reed claimed she never used cocaine, but then testified that when "Sean" first put her in a strip club, she did a line of cocaine when he told her it would help her be friendly; she then claimed that this was "after they already had control over [her]." AR 131. Reed testified that she took care of her children and cooked

4

their meals. Id.

Dr. Glassmire testified that based on her medical records, Reed had the medically determinable impairments of bipolar disorder, posttraumatic stress disorder, a personality disorder with borderline narcissistic histrionic traits, and cocaine and hallucinogen abuse. AR 132-33. He concluded that those conditions, either singly or in combination, did not rise to the level of the listings. AR 133. Dr. Glassmire concluded that in activities of daily living, Reed had mild difficulties. In social functioning, and concentration, persistence, or pace, she had moderate difficulties. As for episodes of decompensation, Reed had experienced one to two episodes of decompensation of extended duration. He would limit her to simple, repetitive tasks, no interaction with the public, no tasks requiring hypervigilance, no fast-paced work, and no safety responsibilities. Id.

Dr. Glassmire then summarized the psychological evaluation performed by Dr. Mark Pierce at the ALJ's behest in October 2010. Reed reported to Dr. Pierce that she was able to dress, bathe, take care of household chores and cook, but did not shop or pay bills. AR 133. Her short-term memory was moderately efficient and she failed the malingering excessive memory test—in other words, the test showed that she was faking a poor memory. AR 134. There were indications that Reed was not making a valid effort in other tests. Id. She had extreme problems interacting with others, but could perform simple tasks. AR 135. Overall, Dr. Pierce believed that the scores "underestimated" her actual abilities. Id.

A vocational expert ("VE") also testified. AR 140. Based on limitations posed by the ALJ (no exertional limits but limited to simple, repetitive tasks, no interaction with the public, no tasks requiring hypervigilance, no fast-paced work, and no safety responsibilities), the VE concluded that Reed could not perform any of her past work. AR 141-42. The ALJ asked the VE whether

5

there were other occupations in the national economy she could perform. AR 142. At this point, Reed interrupted and said, "I make a good stripper." Id. The VE stated that under the ALJ's limitations, Reed could perform the duties of hand packager, kitchen helper, and laundry worker. Id.

## C.   ALJ Decision

Applying the five-step sequential evaluation process, the ALJ found at step two that Reed had the severe mental impairments of "bipolar disorder; post traumatic stress disorder; and a personality disorder, not otherwise specified, with borderline narcissistic traits." AR 74. At step three, the ALJ concluded that Reed did not have an impairment or combination of impairments that met or medically equaled one of the regulatory listed impairments, based on her failure to satisfy the "Paragraph B" or "Paragraph C" criteria. AR 74-75. The ALJ continued on in step three to find that Reed had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, with certain nonexertional limitations; the ALJ found that Reed's mental impairments "limit her to simple, repetitive tasks in a non-public work environment. She is precluded from tasks requiring . . . hypervigilance, fast-paced work, and responsibility for the safety of others." Id. As part of this finding, the ALJ found Reed's statements concerning the intensity, persistence, and limiting effects of her symptoms not credible to the degree they were inconsistent with the ALJ's assessment. AR 77. At step four, the ALJ concluded that Reed was unable to perform any past relevant work. AR 83. Last, at step five, the ALJ concluded that Reed could perform jobs that existed in significant numbers in the national economy—specifically, the jobs referenced by the VE. AR 83-84.

///

///

///

## II.

## ISSUES PRESENTED

The Joint Stipulation presents four issues: (1) whether the ALJ's failure to complete a Psychiatric Technique Review Form ("PTRF") requires a remand; (2) whether Reed's mental impairments, singly or in combination, met the criteria of the listings; (3) whether Reed's statements concerning the intensity, persistence, and limiting effects of her symptoms were credible; and (4) whether the ALJ's decision to decline to adopt the VA's 100% disability rating was warranted by the medical evidence. Joint Stipulation at 4-22.[2]

## III.

## DISCUSSION

**A.    Standard of Review**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free from legal error and are supported by substantial evidence based on the record as a whole. Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007) (citing Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999)). Substantial evidence means such relevant evidence as a reasonable person might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla, but less than a preponderance. Id. To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's

---

[2] Although the Court frames the issues differently than the parties do in the Joint Stipulation, it believes that its formulation accurately reflects the parties' arguments.

7

conclusion." <u>Reddick v. Chater</u>, 157 F.3d 715, 720 (9th Cir. 1998) (citations omitted). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner. <u>Id.</u> at 720-21 (citation omitted). "The court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1038 (9th Cir. 2008) (internal quotation marks and citations omitted).

**B.    The ALJ's Failure to Complete a PTRF Was Not Error**

Reed argues that this matter must be remanded because the ALJ failed to document his evaluation of Reed's mental impairments with a PTRF. JS at 5-6, 10.

**1.    Applicable Regulations**

"In step two of the disability determination, an ALJ must determine whether the claimant has a medically severe impairment or combination of impairments." <u>Keyser v. Comm'r Soc. Sec. Admin.</u>, 648 F.3d 721, 725 (9th Cir. 2011). In making this determination, the regulations require a special psychiatric review technique for evaluating mental impairments. <u>See</u> <u>id.</u> Specifically, the ALJ must determine whether an applicant has a medically determinable mental impairment, rate the degree of functional limitation for four functional areas, determine the severity of the mental impairment, and then, if the impairment is severe, proceed to step three of the disability analysis to determine if the impairment meets or equals a specific listed mental disorder. 20 C.F.R. §§ 404.1520a, 416.920a; <u>Keyser</u>, 648 F.3d at 725. The regulations specify four functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). The first three functional areas are rated using a five-point scale: none, mild, moderate,

marked, and extreme. 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4). The fourth functional area is rated using a four-point scale: none, one or two, three, and four or more. Id.

At the initial and reconsideration levels of the administrative review process, this technique is documented in a PTRF. 20 C.F.R. §§ 404.1520a(e), 416.920a(e). At hearings before an ALJ, however, the Commissioner need only "document application of the technique in the decision." Id. Specifically, "the written decision must incorporate the pertinent findings and conclusions based on the technique" and "must include a specific finding as to the degree of limitation in each of the functional areas." 20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

### 2.    ALJ's Opinion

At step two, the ALJ concluded that "[t]he claimant's impairments affect her more than minimally; thus, they are considered severe." AR 74. At step three, and in deciding whether Reed met the listing criteria, the ALJ wrote in relevant part:

> The claimant's mental impairments, considered singly and
> in combination, do not meet or medically equal the criteria of
> listings 12.04, 12.06, 12.08, and 12.09. . . In activities of daily
> living, the claimant has mild restriction. In social functioning, the
> claimant has moderate difficulties. With regard to concentration,
> persistence, or pace, the claimant has moderate difficulties. As for
> episodes of decompensation, the claimant has experienced one to
> two episodes of decompensation, each of extended duration.

AR 75. The ALJ then went on to make an RFC finding as a continuation of step three. AR 75-83. In that finding, the ALJ noted that Dr. Glassmire had attested to "mild difficulties in activities of daily living, moderate difficulties in social functioning, moderate difficulties in concentration, persistence, or pace,

and one to two episodes of decompensation." AR 77.

### 3.   Analysis

Insofar as the regulations require the ALJ to identify and rate the degree of impairment of the four functional areas at step two, the ALJ arguably committed legal error by instead using the "technique" at step three. Any error is harmless, however, because (1) the ALJ concluded at step two that Reed's mental impairments were severe, and (2) the ALJ used the technique at step three. See AR 75, 77; Cardenas v. Comm'r of Soc. Sec., No. 14-00603, 2015 WL 1902970, at *5-6 (E.D. Cal. Apr. 27, 2015) (finding harmless error where the ALJ sufficiently incorporated the required analysis into the step five findings and conclusions, rather than at steps two and three). The ALJ did not document the considerations underlying the findings for these four areas, but was not required to do so. See Hoopair v. Astrue, 499 F.3d 1071, 1077-78 (9th Cir. 2007). The ALJ stated his findings based on the technique and included a specific finding as to the degree of limitation in each functional area, which is what the regulations require. See 20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Reed relies on an Eighth Circuit case, Pratt v. Sullivan, 956 F.2d 830 (1992), to argue that the ALJ should have completed and attached a PTRF form to his opinion. JS at 6. At the time Pratt was decided, the regulations required the ALJ to attach a PTRF to his opinion. Pratt, 956 F.2d at 834; see, e.g., 20 C.F.R. § 404.1520a(d)(2) (2000). The regulations no longer contain this requirement.  See Keyser, 648 F.3d at 725-726 (noting that the regulations no longer required ALJs to attach a PTRF to their written decisions).

Reed also argues that the ALJ incorrectly concluded that Reed did not have a medically determinable impairment. JS at 6. But in fact, the ALJ did conclude that Reed had medically determinable impairments and found that those impairments were severe. See AR 74. The ALJ then determined that Reed's impairments did not meet or medically equal one of the listed

impairments in the regulation by applying the "paragraph B" and "paragraph C" criteria, as explained further below. Again, this was in keeping with the regulatory requirements.

## C.   Reed Has Not Shown That She Met or Equaled a Listing

Reed argues that the ALJ erred in finding that she did not meet or equal a listing because the ALJ "misinterpreted 'paragraph B' criteria for the claimant's mental impairments." JS at 10.

### 1.   Applicable Regulations

In order to meet the requirements of listing 12.04 (affective disorders), 12.06 (anxiety related disorders), 12.08 (personality disorders), or 12.09 (substance addiction disorders), a claimant must satisfy the criteria in either paragraphs A and B or paragraph C of the listing. See 20 C.F.R. pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06, 12.08, 12.09. As paragraph C is not at issue here, the Court does not discuss it.

In each listing, "paragraph A" lists specific symptoms, signs, and laboratory findings, which substantiate medically the presence of a particular mental disorder.[3] 20 C.F.R. pt. 404, Subpt. P, App. 1, § 12.00; see 20 C.F.R. pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06, 12.08, 12.09. Paragraph B notes that the medical findings in "paragraph A" must result in at least two of: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of

---

[3] The structure of the listing for substance addiction disorders, 12.09, is different from that for the other mental disorder listings because it is structured as a reference listing and thus only serves "to indicate which of the other listed mental or physical impairments must be used to evaluate the behavioral or physical changes resulting from regular use of addictive substances." 20 C.F.R. pt. 404, Subpt. P, App. 1, § 12.00.

"decompensation" (defined as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning"), each of "extended duration" (meaning three episodes within 1 year or an average of once every 4 months, each lasting for at least 2 weeks). Id. "Marked" means "more than moderate but less than extreme." 20 C.F.R. pt. 404, Subpt. P, App. 1, § 12.00. "Marked" is not determined by a specific number of activities of daily living in which functioning is impaired, different behaviors in which social functioning is impaired, or tasks the claimant is unable to complete, but by the "nature and overall degree of interference" with that function. Id.

## 2.    ALJ Opinion

At step three, the ALJ wrote the following with respect to the "paragraph B" criteria:

> To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.
>
> In activities of daily living, the claimant has mild restriction. In social functioning, the claimant has moderate difficulties. With regard to concentration, persistence, or pace, the claimant has moderate difficulties. As for episodes of decompensation, the claimant has experienced one to two episodes of decompensation, each of extended duration. Because the claimant's mental

12

impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

AR 75.

### 3.    Analysis

Reed has not satisfied her burden of showing that her impairments met or equaled a listing. See Burch v. Barnhart, 400 F.3d 676, 683 (9th Cir. 2005) (holding that the plaintiff bears the burden of proving that she has an impairment that meets or equals the criteria of a listing, and should "specify which listing she believes she meets or equals . . . [and] set forth any evidence which would support the diagnosis and findings of a listed impairment"). Although Reed contends that the ALJ erred in concluding that she did not meet or equal a listed impairment, Reed does not specify which listing she believes she meets or equals or set forth any evidence to support the diagnosis and findings of a listed impairment. Reed simply argues that "the ALJ repeated the conclusions reported by Dr. Glassmire but only generally discussed the evidence of the claimant['s] mental impairment." JS at 10.

The ALJ was "not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless [Reed presented] evidence in an effort to establish equivalence." See Burch, 400 F.3d at 683. The only evidence Reed presents here are her own statements from the October 2010 psychiatric examination that she: (1) does not pay her own bills or handle her own money; (2) is unable to drive and move about within the community without her children; and (3) is "avoidant" with family, relatives, friends, neighbors, and others.[4] JS at 9; see

---

[4] The few record citations Reed provides in the Joint Stipulation are

AR 514.

The ALJ made a justifiable adverse credibility finding, as explained further below. This credibility finding would have applied to Reed's claim that she was unable to drive or go anywhere without her children. See AR 120 (testifying that she was able to drive, including taking her children to and from school—meaning, necessarily, that in half of those drives, her children were not present in the car). Furthermore, Reed does not explain how any of these three claims fit into the "paragraph A" criteria or should have changed the ALJ's "paragraph B" conclusions. In addition, the ALJ referenced Reed's claim that she could not handle money. See AR 77. Last, based on the 2010 examination and in keeping with Reed's moderate restrictions in social functioning and "avoidance," the ALJ found that one of Reed's limitations was that she could only do "non-public work." AR 81.

Accordingly, the Court finds that Reed has not demonstrated that the ALJ erred in finding that her impairments did not meet or equal a listing. Reversal on this claim of error is not warranted.

## D.  The ALJ Properly Discounted Reed's Testimony

Reed argues that the ALJ improperly determined that Reed's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible. JS at 11-17.

### 1.  Applicable Law

To determine whether a claimant's testimony about subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis. Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009) (citing Lingenfelter, 504 F.3d at 1035-36). First, the ALJ must determine whether the claimant has presented

universally incorrect. See, e.g., JS at 9 (citing only to "AR 6" and "p. 3" for Dr. Glassmire's testimony and the 2010 report, which are found respectively at AR 133 and AR 514.)

objective medical evidence of an underlying impairment which could reasonably be expected to produce the alleged pain or other symptoms. Lingenfelter, 504 F.3d at 1036 (citing Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). "[O]nce the claimant produces objective medical evidence of an underlying impairment, an adjudicator may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain." Bunnell, 947 F.2d at 345 (citation omitted). To the extent that an individual's claims of functional limitations and restrictions due to alleged pain are reasonably consistent with the objective medical evidence and other evidence, the claimant's allegations will be credited. Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at *2 (July 2, 1996) (explaining 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4)).

If the claimant meets the first step and there is no affirmative evidence of malingering, the ALJ must provide specific, clear, and convincing reasons for discrediting a claimant's complaints. Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006) (citing Smolen v. Chater, 80 F.3d 1273, 1283-84 (9th Cir. 1996)). "'General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints.'" Reddick, 157 F.3d at 722 (quoting Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996)). The ALJ must consider a claimant's work record, observations of medical providers and third parties with knowledge of the claimant's limitations, aggravating factors, functional restrictions caused by symptoms, effects of medication, and the claimant's daily activities. Smolen, 80 F.3d at 1283-84 & n.8. The ALJ may also consider an unexplained failure to seek treatment or follow a prescribed course of treatment and employ other ordinary techniques of credibility evaluation. Id. (citations omitted).

///

///

15

### 2.    Analysis

Reed presented objective medical evidence of an underlying impairment that could reasonably have produced her alleged symptoms. However, there was affirmative evidence of malingering. The ALJ remarked on the fact that Reed had failed the malingering test in October 2010, and that she did not give a valid effort or gave a borderline valid effort on other tests. AR 77, 82, 515-17. Even if there had not been evidence of malingering, the ALJ provided specific, clear and convincing reasons for discrediting Reed's complaints, each of which is supported by substantial evidence in the record.

The ALJ noted that Reed testified at the hearing that her right eye would not hold still (AR 98-99), yet an eye exam in June 2009 showed that her vision was entirely normal except for 20/40 vision. AR 77, 466-71. "In weighing a claimant's credibility, the ALJ may consider [her] reputation for truthfulness, inconsistencies either in [her] testimony or between [her] testimony and … testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which [she] complains." Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997).

The ALJ also noted Reed's "lackadaisical response to psychiatric treatment," despite her claims of severe psychiatric problems. AR 81. At the hearing, Reed attributed this response to paranoia about going to San Bernardino County—where the local VA Hospital is (AR 119-22)—but the ALJ noted that Reed had consistently missed appointments at her local county mental health clinic in Riverside.  AR 79-80, 397 ("no-show" on December 30, 2008), 400 (on February 26, 2009, Riverside facility "called [Reed] to . . . determine why [she] missed her" appointments, and Reed claimed she had been visiting another clinic), 396 ("no-show" on March 11, 2009), 399 (April 21, 2009 notes state, "Discussed with [Reed] that she has missed several psychiatrist appts," to which Reed replied, "I was told to just walk-in for

services."). The ALJ concluded that "the overall evidence of record shows that the claimant consults medical professionals only when it suits her purpose, such as her attempt to regain her driver's license [in September 2009]." AR 81. In this September 2009 visit, Reed went to the Loma Linda VA Hospital and requested assistance in retrieving her driver's license; Reed claimed that she had become upset at her boyfriend during an argument, and he had called the police and claimed that she had a seizure when she had just been dry heaving. AR 494-508. The ALJ noted that the record showed no treatment for any condition after that point. AR 81. See Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989) (holding that ALJ may consider unexplained or inadequately explained failure to seek treatment when considering the credibility of claimant's testimony); Smolen, 80 F.3d at 1284 (same).

　　"Apart from objective findings," the ALJ also noted that Reed was "overly dramatic" in her presentation at both hearings. AR 81. The ALJ noted inconsistencies in Reed's testimony regarding where she was filmed in pornographic movies; in the hearing, she insinuated that it was when she was abducted and taken to Las Vegas, AR 95, 130, but in September 2009, she reported that she was tested for HIV in Los Angeles while she was making a pornographic film. AR 82, 497. The ALJ noted that Reed claimed at the hearing that she was forced into prostitution, see AR 94, 97, yet when Reed was hospitalized in November 2008, she said she started prostitution to survive and pay her bills; she did not mention being kidnapped or forced. AR 82, 334. During a June 2009 examination, Reed claimed that she had performed certain activities of daily living, contrary to her testimony at the hearing. AR 78, 82, 474 ("[Reed's] outside activities include 'taking daughter to dance and class, taking son to karate and bible study.' . . . She is able to handle her own money. Her activities of daily living include taking care of her children."). In contradiction to her testimony at the hearing, see AR 132, Reed had reported

in June 2009 helping with her children's homework. AR 82, 473. The ALJ noted that during the June 2009 examination, Reed denied appetite and weight changes, said she occasionally had a good memory and concentration, and denied guilt feelings, helplessness, worthlessness, hopelessness, anhedonia, suicidal ideation, suicidal intention or plans, and decreases in pleasurable activities. AR 82, 473, 477. The ALJ properly relied on these discrepancies. See Tommasetti, 533 F.3d at 1039 (holding that an ALJ may consider many factors in weighing a claimant's credibility, including "ordinary techniques of credibility evaluation, such as . . . prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid." (quoting Smolen, 80 F.3d at 1284)).

The ALJ also remarked on Reed's sarcastic comment about being able to perform as a stripper during the VE's testimony, and concluded that this sarcasm made it less likely that Reed was as traumatized by her alleged abduction as Reed claimed. AR 81-82. The ALJ also would have found Reed's testimony more believable if she had reported the alleged kidnapping, forced prostitution, and sexual assaults to authorities. AR 82. While the Court does not necessarily agree with this reasoning, even if the ALJ erred in discrediting Reed based upon her comment, any error would be harmless as the ALJ's other reasons were supported by substantial evidence. See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1162-63 (9th Cir. 2008)

Reed makes several related arguments that this Court will briefly address. First, Reed argues that the ALJ should have taken into account Dr. Pierce's October 2010 report. JS at 12-13. But the record shows that the ALJ did take Dr. Pierce's report into account and explicitly adopted Dr. Pierce's conclusion that Reed be limited to simple, non-public tasks. See AR 81. The ALJ declined to adopt the remaining limitations suggested by Dr. Pierce precisely because there was ample evidence of Reed's malingering during the

exam. <u>Id.</u>

Second, Reed argues that the ALJ cannot disregard Reed's statements about her symptoms solely because they were not substantiated by objective medical evidence. JS at 13. That is true. <u>See</u> <u>Robbins</u>, 466 F.3d at 883 (citations omitted). But an ALJ may use the medical evidence in the record as one factor in his evaluation, as the ALJ did here. <u>See</u> <u>Lingenfelter</u>, 504 F.3d at 1040.

Third, Reed argues that the ALJ should have taken into account the VE's responses to certain hypotheticals posed to the VE. JS at 13-15. The ALJ asked the VE whether Reed's absence from work once a week or a third of each day due to anxiety or depression would affect the VE's conclusions, and the VE stated that those factors would eliminate any possible available jobs. AR 142-43. Contrary to Reed's apparent belief, the VE was not opining that she was in fact subject to these limitations (an opinion that would have been beyond the scope of a vocational expert). The ALJ was merely posing hypotheticals based on a limitation that, in the end, the ALJ apparently concluded was not supported by the evidence.

Fourth, Reed argues that the ALJ should have explored Reed's reasons for failing to seek medical care. JS at 15-17. The ALJ did explore Reed's reasons. At the second hearing, in response to the ALJ's questioning, Reed claimed that she was not getting treatment because she was uncomfortable leaving Riverside, and there was no VA facility in Riverside. AR 119, 121. Even though the ALJ did not ask Reed why she had consistently missed appointments at the local county mental health clinic in Riverside, the Court does not agree that the ALJ was required to do so.

Reed cites a Seventh Circuit case, <u>Craft v. Astrue</u>, 539 F.3d 668 (7th Cir. 2008) for the proposition that the ALJ had a responsibility to affirmatively question Reed about her failure to seek treatment. JS at 16. To the extent that

<u>Craft</u> stands for this proposition, the Ninth Circuit has reached a different conclusion. <u>See</u> <u>Merritt v. Colvin</u>, 572 F. App'x 468, 470-71 (9th Cir. 2014) ("While the ALJ did not question Merritt as to why he missed his appointments, this fact alone does not require us to find that the ALJ erred because, as the magistrate judge found, 'the medical record [Merritt] cites to support his argument fails to show his relationship problems prevented him from being able to pursue treatment.' Moreover, Merritt has not presented any evidence to suggest that his failure to attend treatment 'was attributable to his mental impairment.'" (footnote and citation omitted)).

Nor does Social Security Ruling 96-7p compel a different result. As a footnote in <u>Merritt</u> explains, Social Security Ruling 96-7p states that an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide." <u>See</u> <u>Merritt</u>, 572 F. App'x at 471 n.1; SSR 96-7P, 1996 WL 374186, at *7 (July 2, 1996). SSR 96-7p goes on to state only that the ALJ "may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual . . . does not pursue treatment in a consistent manner." <u>Id.</u> By its own terms, therefore, SSR 96-7 does not require that the ALJ ask the claimant why he did not pursue regular medical treatment.[5] <u>Merritt</u>, 572 F. App'x at 471 n.1.

---

[5] Reed claims in the Joint Stipulation that she is "currently consulting" with a doctor at the VA's Loma Linda location. JS at 16. While that is commendable, Reed does not contest that at the time of the ALJ's credibility determination, she was not seeking treatment and had not sought treatment since September 2009 (when she sought to reinstate her driver's license). In determining whether to remand based on new evidence, the court looks at "whether the new evidence is material to a disability determination and whether the claimant has shown good cause for having failed to present the

Fifth, Reed claims that the ALJ relied on boilerplate language in the adverse credibility finding. JS at 17. While the ALJ did use boilerplate language for the actual finding, what followed was pages of non-boilerplate language regarding the ALJ's reasons for that finding. See AR 76-82.

"If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing." Tommasetti, 533 F.3d at 1039 (9th Cir. 2008) (internal quotation marks and citation omitted). This Court will not second-guess the ALJ's credibility finding, as it is supported by substantial evidence in the record as outlined above.

**E.      The ALJ Gave Valid Reasons for Rejecting the VA's Disability Rating**

Reed argues that the ALJ's failure to state his reasons for declining to adopt the VA's disability rating requires remand. JS at 20-22.

In June 2009, the VA determined that Reed's bipolar disorder with psychotic features was related to her military service, and gave her a disability rating of 100%. AR 279-281. In his decision, the ALJ noted the rating, and acknowledged that the Ninth Circuit believes that the VA disability analysis is consistent with the Social Security Administration's disability evaluation. AR 82. The ALJ declined to adopt the rating because "[y]et, again, in the Social Security record, the allegations are not supported in the file." Id.

---

new evidence to the ALJ earlier." Mayes v. Massanari, 276 F.3d 453, 462 (9th Cir. 2001). In addition, the claimant must demonstrate that there is a "reasonable possibility" that the new evidence would have changed the outcome of the administrative hearing. Id. (citing Booz v. Sec'y of Health & Human Servs., 734 F.2d 1378, 1380-81 (9th Cir. 1984)). Here, there is not a "reasonable possibility" that the fact that Reed is now seeking treatment would have changed the ALJ's credibility determination because it does not explain the missed mental health appointments cited by the ALJ nor does it account for the gap in treatment noted by the ALJ beginning in September 2009 and lasting more than a year.

The phrase "yet again" is an obvious reference to the ALJ's credibility findings regarding Reed's complaints about her symptoms. Furthermore, the ALJ went on to note once more that Reed's complaints were inconsistent with her refusal to seek treatment and missing appointments. Id. A VA determination of disability is "ordinarily" entitled to "great weight," but an ALJ may "give less weight to VA disability rating if he gives persuasive, specific, valid reasons for doing so that are supported by the record." Berry v. Astrue, 622 F.3d 1228, 1236 (9th Cir. 2010) (citations and internal quotation marks omitted.) The ALJ gave valid reasons throughout the decision, and specifically referenced those reasons in rejecting the VA's rating. Remand is not warranted on this basis.

## IV.

## CONCLUSION

For the reasons stated above, the decision of the Social Security Commissioner is AFFIRMED and the action is DISMISSED with prejudice.

Dated:   March 18, 2016

_____
DOUGLAS F. McCORMICK
United States Magistrate Judge